**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas Montgomery, et al., | No. CV-17-00201-TUC-RM |
| Plaintiffs, | **ORDER** |
| v. | |
| Union Pacific Railroad Company, | |
| Defendant. | |

Pending before the Court is Defendant Union Pacific Railroad Company's Motion for Summary Judgment. (Doc. 58.) The Motion is fully briefed and suitable for determination without oral argument. (Docs. 65, 69.) For the following reasons, the Motion is denied.

**I.    Background**[1]

**A.    Defendant's Train Crew Position**

A position on Defendant's Train Crew is an entry-level position. (DSOF ¶ 1.) The essential functions of a Train Crew position include, but are not limited to: operating locomotive equipment; applying and releasing hand brakes; riding rail cars; climbing onto and off of equipment; maintaining balance and coordination on equipment; reacting

---

[1] The following facts are undisputed unless otherwise noted. Fed. R. Civ. P. 56(e)(2). The Court also may consider other material on the record that is not included in either party's statement of facts. Fed. R. Civ. P. 56(c)(3). Defendant's Statement of Facts (Doc. 60) is referred to as "DSOF." Plaintiff's Controverting Statement of Facts (Doc. 66) is referred to as "PSOF," and his Statement of Supplemental Facts (Doc. 66) is referred to as "PSSF."

quickly to situations; operating various designs of track switches and derails; observing or monitoring track conditions, the railroad right-of-way, and passing trains; inspecting all train cars and other equipment before leaving the yard or as needed; observing, interpreting, and relaying hand, lantern, and other signals affecting the movement of the train; and judging and controlling the speed and clearance distance of cars. (DSOF ¶¶ 3–5.) The parties agree that employees working on the Train Crew work alone next to live train tracks and may cross or work between rail cars, although they disagree as to how frequently employees do those tasks alone. (DSOF ¶ 6; PSOF ¶ 6.)

The parties also agree that Defendant's job description repeatedly states the importance of safety in Train Crew positions: applicants "must have zero work related safety violations in the past two years" and "must practice safe work habits to prevent on the job accidents and injuries." (DSOF ¶ 9.) The parties dispute, however, whether the essential functions of a Train Crew position include the ability to perform the job safely. Defendant asserts that because it considers Train Crew positions particularly safety-sensitive, the ability to safely perform the job duties is an essential function of the Train Crew position. (DSOF ¶¶ 7–8.) Plaintiff asserts that Defendant's Train Crew job description does not require an applicant to perform the essential functions safely, only that the applicant merely be physically able to perform them. (PSOF ¶ 8.)

Prior to clearing a Train Crew member for employment, Defendant requires applicants to complete a Health History Questionnaire and an in-person physical examination at Logistics Health Incorporated ("LHI"). (DSOF ¶ 10.) LHI then sends the applicant's records to Defendant's Health and Medical Services office, where the fitness-for-duty nurses review the file and work with an Associate Medical Director to determine if there are any health issues that may pose a safety concern. (DSOF ¶ 11.) The Associate Medical Director determines if there is a significant direct threat or an issue with the applicant meeting the essential functions of the job. (DSOF ¶ 11.) The Chief Medical Officer, Dr. John Holland, weighs in as appropriate. (DSOF ¶ 11.)

Defendant imposes work restrictions on employees with a risk of sudden

incapacitation greater than 1% per year. (DSOF ¶ 18.) Defendant bases its work restrictions in part on the Medical Examiner Handbook for the Federal Motor Carrier Safety Administration ("FMCSA"). (DSOF ¶ 19.) The FMCSA is the lead federal agency responsible for regulating and providing safety oversight of commercial trucking. (DSOF ¶ 20.) For several decades, the FMCSA has published and revised guidance for medical examiners regarding how they should evaluate whether a commercial driver is fit for duty in terms of safety. (DSOF ¶ 20.) The FMCSA handbook is based on systematic literature reviews and panels of medical experts who have reviewed the literature and provided guidance. (DSOF ¶ 21.) The FMCSA is particularly concerned with sudden incapacitation and physical impairments that affect safety at work. (DSOF ¶ 21.)

Defendants assert that the FMCSA Handbook is one of the most extensive sets of literature regarding fitness-for-duty criteria for any agency within the U.S. Department of Transportation, and, thus, Defendant uses it as one of several sources when evaluating railroad workers in safety-critical positions. (DSOF ¶ 22.) Plaintiff disputes that the FMCSA Handbook sets fitness-for-duty criteria for other agencies within the Department of Transportation. (PSOF ¶ 22.) Plaintiff further disputes that the FMCSA Handbook requires Defendant to apply its 1% policy to employees who do not require a commercial driver's license to do their jobs, and that the 1% policy is in accordance with current leading medical literature. (PSOF ¶ 19; PSSF ¶ 32.)

### B. Plaintiff's Medical Condition

In January 2012, Plaintiff suffered a ruptured cerebral aneurysm and related subarachnoid hemorrhage. (DSOF ¶¶ 30, 50.) Plaintiff described the symptoms of his aneurysm as beginning with a snap, followed by "a rush of water filling up [his] head," followed in turn by heat flashes, nausea, and black spots in his vision. (DSOF ¶ 42.) Plaintiff's physician treated this condition by endovascular insertion of a metal coil into the aneurysm. (DSOF ¶ 31.)

The parties dispute, based on medical literature and expert testimony, the risk that Plaintiff will have another aneurysm or otherwise become suddenly incapacitated.

Defendant states that Plaintiff has a risk of recurrent rupture or seizure greater than 1% per year. (DSOF ¶¶ 33–34, 36–37, 39–41.) Defendant states that the FMCSA Handbook recommends a minimum waiting period of five years for safety-sensitive positions after an "intracerebral or subarachnoid hemorrhage with risk for seizures." (DSOF ¶ 43.) Plaintiff asserts that his risk of sudden incapacitation, due to either seizures or a recurrent rupture, is less than 1%. (PSOF ¶¶ 33–34, 36–37, 39–41; PSSF ¶ 2.) Plaintiff disputes that the FMCSA Handbook applies, but asserts that if the FMCSA Handbook does apply, the applicable waiting period is the one-year period recommended for individuals who suffered an intracerebral or subarachnoid hemorrhage without risk of seizures. (PSOF ¶ 43; PSSF ¶ 35.)

### C. Offer of Employment and Medical Evaluation

On August 8, 2014, less than three years after his aneurysm, Plaintiff applied for a position on Defendant's Train Crew. (DSOF ¶¶ 23, 45.) At the time of Plaintiff's application, he worked for BNSF Railway Company ("BNSF") as a Train Service Conductor Trainee, a position designated as safety-sensitive and nearly identical to a Train Crew position with Defendant. (PSSF ¶¶ 5–6, 12.) Plaintiff's offer from BNSF was conditioned upon the passage of a medical examination. (PSSF ¶ 6.) Plaintiff provided information to BNSF about his aneurysm, including a letter from his physician stating that he had made "an excellent recovery" and was free from "work restrictions," and BNSF cleared him to begin work. (PSSF ¶¶ 7–9.) Plaintiff suffered no seizures, rebleeds, instances of sudden incapacitation, or other neurological events during his almost year-long tenure at BNSF. (PSSF ¶ 10.)

On October 23, 2014, Defendant extended a job offer to Plaintiff. (DSOF ¶ 24.) The job offer was expressly conditioned upon Plaintiff passing the Preplacement Medical Evaluation ("PME") conducted by Defendant's Health and Medical Services Department. (DSOF ¶ 24.) Plaintiff accepted the conditional job offer on or about October 26, 2014. (DSOF ¶ 26.)

As part of the PME, Plaintiff completed and signed a Health History

Questionnaire. (DSOF ¶ 27.) Upon completion of the Health History Questionnaire, a standard preplacement examination was scheduled for November 10, 2014, between Plaintiff and LHI, Defendant's third-party medical examiner. (DSOF ¶ 29.) During the PME process, Plaintiff informed the medical examiner that he had suffered a ruptured cerebral aneurysm and related subarachnoid hemorrhage. (DSOF ¶ 30.) Plaintiff informed the PME examiner that his physician treated the brain condition by endovascular insertion of a metal coil into the aneurysm. (DSOF ¶ 31.) Plaintiff's disclosure of his brain condition resulted in the flagging of his PME for further review by Defendant's fitness-for-duty nurses. (DSOF ¶ 46.) LHI provided Defendant's nurses with a copy of the Health History Questionnaire and LHI's PME form. (DSOF ¶ 46.)

On November 20, 2014, Defendant requested additional documentation to assist in its pre-employment medical assessment. (DSOF ¶ 47.) Specifically, Defendant requested a copy of the neurologist clinic notes from Plaintiff's 2014 office visit and a copy of the 2014 MRI report. (DSOF ¶ 47.) Defendant's request did not contain a warning advising Plaintiff's physicians to redact or exclude Plaintiff's genetic or family health information. (PSSF ¶ 16.)

On November 25, 2014, Plaintiff was examined by his medical provider and underwent an MRI. (DSOF ¶ 48.) Copies of the documents from that examination were sent to Defendant on November 26, 2014. (DSOF ¶ 48.) On December 3, 2014, Plaintiff requested that another physician send notes of his physical examinations and MRI results via facsimile. (DSOF ¶ 48.) Plaintiff's medical records from April 27, 2012, indicate that Plaintiff experienced memory, concentration, and stamina problems following surgery. (DSOF ¶ 51.)[2]

On December 16, 2014, Dr. John Charbonneau (one of Defendant's contracted medical doctors) noted two primary areas of concern: Plaintiff's brain condition, and Plaintiff's Obstructive Sleep Apnea. (DSOF ¶ 52.) Dr. Charbonneau believed that Plaintiff's medical issues created an increased risk for sudden incapacitation. (DSOF ¶

---

[2] Plaintiff disputes any implication that his symptoms continued indefinitely. (PSOF ¶ 51.)

52.) The next step in Defendant's assessment was for Dr. Charbonneau and Chief Medical Officer Dr. Holland to review and discuss Plaintiff's medical records with Occupational Health Nurse Bridgette Ziemer during a conference call on December 23, 2014. (DSOF ¶ 53.) In that call, Defendant ultimately determined that Plaintiff's potential for future aneurysms made him unfit for a Train Crew position. (DSOF ¶ 53.)

Due to its decision that Plaintiff's medical condition created an unreasonable risk of sudden incapacitation, Defendant revoked its conditional offer of employment. (DSOF ¶ 58.) Defendant did not consider Plaintiff to be permanently restricted from a Train Crew position, but rather determined that Plaintiff's brain condition likely required a five-year work restriction (under the FMCSA Handbook) due to the potential risk of seizure, with reevaluation at that time. (DSOF ¶ 59.)

### D. Plaintiff's Genetic Information

The only medical information Defendant requested as part of its assessment of Plaintiff's fitness for duty was the information provided in the Health History Questionnaire, LHI's visit notes, and neurologist clinic notes from Plaintiff's 2014 office visit and a copy of the 2014 MRI report. (DSOF ¶ 62.) None of the questions on the Health History Questionnaire request information regarding family medical history or other genetic information. (DSOF ¶ 63.) In the medical records provided to Defendant, Plaintiff's neurosurgeon states under the family history section: "Entire family history is negative," and "Father deceased at the age of 76 from unknown cause." (DSOF ¶ 64.) At no time did Defendant make any medical inquiry beyond the information to conduct the PME, and Defendant made no inquiry regarding genetic information. (DSOF ¶ 65.) If genetic information or family history is inadvertently received, Defendant's medical staff does not consider it in making its fitness-for-duty determinations. (DSOF ¶ 66.)

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that a reasonable trier of fact could resolve the dispute in favor of the nonmoving party. *Id.* In evaluating a motion for summary judgment, the court must "draw all reasonable inferences from the evidence" in favor of the non-movant. *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002). A reasonable inference is one which is supported by "significant probative evidence" rather than "threadbare conclusory statements." *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680–81 (9th Cir. 1985) (internal quotation marks omitted). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor*, 311 F.3d at 1150.

The party moving for summary judgment bears the initial burden of identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and emphasis omitted); *see also* Fed. R. Civ. P. 56(c)(1).

### III. Discussion

Plaintiff brings two claims under the Americans with Disabilities Act ("ADA"). In Count One, Plaintiff alleges Defendant rescinded his job offer based on disability in violation of 42 U.S.C. § 12112(a). In Count Two, Plaintiff alleges Defendant's 1% policy constitutes unlawful screening in violation of §§ 12112(a) & (b)(6). Defendant initially argued that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Plaintiff's ADA claims. There is no dispute, however, that Defendant rescinded Plaintiff's job offer based on his prior aneurysm. Therefore, the burden-shifting framework is inapplicable. *Snead v. Metro. Prop. & Cas. Ins.*, 237 F.3d 1080, 1093 n.10 (9th Cir. 2001).

Plaintiff also brings a claim under the Genetic Information Nondiscrimination Act

("GINA"). In Count Three, Plaintiff alleges Defendant requested his family medical history in violation of 42 U.S.C. § 2000ff-1(b). There is no dispute that Defendant did not use Plaintiff's genetic information or family medical history to make its fitness-for-duty determination.

### A. Americans with Disabilities Act

#### 1. Qualified Individual

Defendant contends it is entitled to summary judgment because Plaintiff cannot show he is a "qualified individual" within the meaning of the ADA. Plaintiff responds that he is qualified and asserts that, at a minimum, there is a triable issue as to whether he is qualified because he performed a substantially similar job for approximately one year prior to having the employment offer rescinded. The Court finds there is a triable issue of fact as to whether Plaintiff is a qualified individual.

To state a claim under § 12112(a), Plaintiff must show (among other things) that he is a qualified individual with a disability. *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 798–99 (9th Cir. 2017) (citing *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013)). A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Qualification for a position is a two-step inquiry. The court first examines whether the individual satisfies the 'requisite skill, experience, education and other job-related requirements' of the position." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc). Defendant does not argue that Plaintiff lacks the required skill, experience, or education necessary for a Train Crew position.

The next step requires the Court to "consider[] whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation." *Id.* (citations omitted). Essential functions are the "fundamental job duties of the employment position," not including "the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). In determining what functions are essential, courts

may consider the following factors:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

*Id.* § 1630.2(n)(3)(i)–(vii). "A highly fact-specific inquiry is necessary to determine what a particular job's essential functions are." *Cripe v. City of San Jose*, 261 F.3d 877, 888 n.12 (9th Cir. 2001) (citations omitted).

Here, the threshold issue is whether the ability to safely perform the duties of a Train Crew position is itself an essential function. Defendant argues that safety *is* an essential function, given the nature of Train Crew members' responsibilities (e.g., riding rail cars, balancing on equipment, operating track switches and derails) and the possibility of disastrous consequences should something go wrong (e.g., death, serious injury, and property damage, all of which occurred in a 2014 train collision caused when an employee lost consciousness). Plaintiff asserts that he need only show he can physically perform the job duties to be qualified, and he disagrees that safe performance is an essential function.

The Court agrees with Defendant and finds that safety is an essential function of a train crew position. However, there is a triable issue of fact whether Plaintiff can perform that function. Defendant argues the reason Plaintiff cannot perform his job safely is because his risk of sudden incapacitation due to seizure or recurrent rupture is over 1% per year (specifically, between 1% and 5%). (Holland Dep. 58:10–24, 87:5–9, 107:5–109:6, Docs. 60-2, 67-1.) This argument rests on the expert medical opinion of Dr. Holland, who testified that Plaintiff's risk of rupture is closer to 5% based on a meta-analysis completed after Defendant's employment decision. (*Id.* at 83:7–84:20, 87:5–9.) Dr. Holland further testified that prior literature placed Plaintiff's risk between 1% and

3%. (*Id.* at 87:13–88:19.) Dr. Holland believes that Plaintiff is at an increased risk of rupture due to his hypertension/high blood pressure, thyroid condition, obesity, and potential to work in high heat and humidity. (Holland Decl. ¶ 17, Doc. 60-3.)

It is also the opinion of Dr. Holland and Dr. Raymond Schumacher that Plaintiff has a substantially increased risk of suffering a seizure. (*Id.* ¶ 18; Schumacher Report 3–4, Doc. 60-13.) Dr. Holland opines that Plaintiff is at risk of seizures, even if seizures have never occurred, for two reasons: first, the subarachnoid hemorrhage spread to Plaintiff's brain cortex, evidenced by Plaintiff's subsequent problems with concentration and short term memory; and second, Plaintiff had two recent frontal lobe infarctions. (Holland Decl. ¶ 18.) Based on the foregoing, and Defendant's 1% policy, Dr. Holland opines that Plaintiff presented an unacceptable risk of sudden incapacitation. (*Id.* ¶ 19.)

Predictably, Plaintiff's expert disagrees. Dr. Kevin Trangle places Plaintiff's risk of rupture or seizure at one-tenth of 1%. (Trangle Rebuttal Report 5, Doc. 67-6.) Dr. Trangle disagrees that hypertension/high blood pressure, thyroid issues, and working in hot and humid areas are additional risk factors for rupture. (Trangle Dep. 46:25–48:1, Doc. 67-3.) He opines that Plaintiff is not at an increased risk for seizure because the risk depends on the location of the hemorrhage, and Plaintiff's hemorrhage occurred in an area not associated with increased risk for seizures. (Trangle Report 9, Doc. 67-4.) He also opines that Plaintiff's hemorrhage did not spread to the brain cortex, as Dr. Holland believes. (*Id.* at 8.) Finally, Dr. Trangle questions the reasonableness of Defendant's 1% policy and opines that, assuming the policy is reasonable, Plaintiff easily satisfied it and could have performed his full duties. (Trangle Rebuttal Report 5.)

The Court agrees with Plaintiff that "[t]his case is a battle of expert opinions about whether [he] was qualified for the Train Crew position." Defendant's sole argument that Plaintiff is not qualified is that Plaintiff poses a risk of sudden incapacitation greater than 1%. Defendant's expert says that Plaintiff's risk is greater than 1%; Plaintiff's expert says it is not. It is not a district court's function on summary judgment to "resolve an issue of fact based on conflicting expert testimony." *Scharf v. U.S. Attorney Gen.*, 597

F.2d 1240, 1243 (9th Cir. 1979); *see Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion."). Whether Plaintiff is qualified is an issue for the jury.

### 2. Unlawful Screening

An ADA claim requires proof that the employer discriminated against the plaintiff on the basis of disability. *Dunlap*, 878 F.3d at 798–99 (citation omitted). Discrimination includes the use of "qualification standards . . . that screen out or tend to screen out an individual with a disability . . . unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6). There is a two-step analysis under this statute. *Cripe*, 261 F.3d at 886. The first step requires an examination of whether the defendant's qualification standards screen out or tend to screen out disabled individuals. *Id.* There is an affirmative defense available to defendants at the first step; defendants may rely on qualification standards that "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1027 (9th Cir. 2003) (quoting 42 U.S.C. § 12113(b)). The second step requires an examination of whether the defendant's qualification standard falls within the business necessity exception. *Cripe*, 261 F.3d at 886.

#### (i) Effect of Qualification Standard

At the first step, Defendant argues that Plaintiff's job offer was rescinded based on an individualized assessment, not based on a qualification standard that routinely screens out disabled individuals. Plaintiff disagrees, arguing that disabled individuals are more likely to have a risk of sudden incapacitation greater than 1% and that, since Defendant utilizes the 1% policy across the board for all applicants, disabled individuals are disproportionately screened out. The Court finds there is a triable issue of fact as to whether Defendant utilizes a qualification standard that screens out disabled individuals.

The Court is not persuaded by Defendant's focus on the medical assessment of

Plaintiff, which involved multiple medical officials examining and discussing Plaintiff's medical records. That indisputably occurred. However, that assessment was geared toward making a single determination: whether or not Plaintiff's risk of sudden incapacity is greater than 1% per year because, if so, Plaintiff presented an unacceptable safety risk and was unfit for employment. (Holland Dep. 58:10–24, 107:5–109:6.) It is the 1% policy that Plaintiff complains of. Federal law does not require Defendant to employ that standard. (*Id.* at 60:1–8.) Furthermore, it is a logical inference that non-disabled people are less likely than disabled people to become suddenly incapacitated. *See Anderson*, 477 U.S. at 255 (explaining that nonmovant on summary judgment is entitled to "all justifiable inferences"). If so, then the 1% policy would "tend to screen out an individual with a disability . . . ." 42 U.S.C. § 12112(b)(6). Whether the 1% policy does in fact screen out disabled individuals is a determination for the ultimate factfinder.

### (ii) Direct Threat Defense

Still at the first step, Defendant contends that even if the 1% policy screens out disabled individuals, Plaintiff's ADA claims must fail because Plaintiff poses a direct threat. "[T]he burden of establishing a direct threat lies with the employer." *Echazabal*, 336 F.3d at 1027 (citations omitted). An individual is a direct threat if he or she poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

> Before excluding an individual from employment as a direct threat, an employer must demonstrate that it has made an "individualized assessment" of the employee's ability to perform the essential functions of the job, "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). The factors to be considered include: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." *Id.*

*Echazabal*, 336 F.3d at 1027 (footnote omitted).

Plaintiff has raised a material issue of fact as to whether Defendant's decision was

"based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." 29 C.F.R. § 1630.2(r). To start, it is not clear from the record that Dr. Holland relied on the most current medical knowledge at the time of Defendant's employment decision. During his deposition, he first cited a meta-analysis that was completed in 2017 and thus could not have been a factor in his decision. (Holland Dep. 83:7–84:20.) Dr. Holland did generally reference "look[ing] at [articles] in the past," which placed the risk of rupture "from one to three percent." (*Id.* at 87:13–88:19.) However, Dr. Holland was unable to provide any details when pressed for information about those articles, so it is unclear whether they also post-date Defendant's employment decision. (*Id.* at 88:20–89:14.) Dr. Holland also indicated that he did not look for the other articles because the meta-analysis is "more applicable in this case," which raises questions as to the appropriateness of his reliance on the other articles at the time of Defendant's employment decision. (*Id.* at 89:1–7.)[3]

Furthermore, it is not clear that Defendant took into consideration that Plaintiff performed substantially similar work at BNSF for almost a year without medical incident. "[T]his Circuit has cautioned that individualized risk assessment also requires consideration of relevant information about an employee's past work history." *Echazabal*, 336 F.3d at 1032 (explaining that a reasonable jury could find that 20 years of experience without incident was proof the plaintiff was not a direct threat), *citing with approval Anderson v. Little League Baseball, Inc.*, 794 F. Supp. 342, 345 (D. Ariz. 1992) (rejecting direct threat defense and giving "great weight" to the plaintiff's three years of experience without incident). Dr. Charbonneau believes he was unaware of Plaintiff's work history, and Dr. Holland does not recall whether or not he was aware. (Charbonneau Dep. 67:17–20; Holland Dep. 93:5–12.) Thus, it is not clear that Defendant gave Plaintiff's circumstances full and proper consideration. Although

---

[3] Dr. Charbonneau questioned the relevancy of the meta-analysis to the present case, testifying he was "not sure it has much to do with the risk going forward." (Charbonneau Dep. 76:20–77:4, Doc. 67-2.) Dr. Schumacher expressed the same opinion, stating he did not "see how this would specifically relate to the issues in this case." (Schumacher Dep. 11:16–25, Doc. 67-7.) A reasonable jury could find that their testimony casts doubt on the reliability of Dr. Holland's opinions as a whole.

1  Plaintiff's injury-free work history is shorter than that of the plaintiffs in *Echazabal* and
2  *Little League Baseball*, a reasonable jury could still rely on it to reject Defendant's direct
3  threat defense.

### (iii) Business Necessity Exception

At the second step, Defendant argues it is entitled to summary judgment because the 1% policy is job-related and consistent with business necessity. The Court finds there is a triable issue as to whether the business necessity exception applies.

"To successfully assert the business necessity defense to an allegedly discriminatory application of a qualification standard . . . an employer bears the burden of showing that the qualification standard is (1) 'job-related,' (2) 'consistent with business necessity,' and (3) that 'performance cannot be accomplished by reasonable accommodation.'" *Bates*, 511 F.3d at 995 (quoting 42 U.S.C. § 12113(a)). A qualification standard is job-related if it "fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Id.* at 996 (citations omitted). A qualification standard is consistent with business necessity if it "substantially promotes the business's needs," taking into account for safety-based qualification standards "the magnitude of possible harm as well as the probability of occurrence." *Id.* (citations, brackets, and internal quotation marks omitted). Finally, an employer must show either that no reasonable accommodation exists or that a proposed accommodation would impose an "undue hardship" on the employer. *Id.* at 996–97 (citations omitted).

Plaintiff has raised a material issue of fact as to whether the 1% policy "fairly and accurately measures" his ability to perform the job safely. *Id.* at 996. The 1% policy is not required by federal law. (Holland Dep. 60:1–8.) It is based on the FMCSA Handbook, which applies to commercial truck drivers, and has not been adopted by the Railroad Safety Advisory Committee ("RSAC") (although Dr. Holland testified it was RSAC's intent to eventually adopt it). (*Id.* at 39:25–42:23; 58:10–24.) Dr. Trangle questions the propriety of the 1% policy. (Trangle Dep. 72:18–74:10 ("Not that I necessarily believe the 1 percent risk should be the actual rule . . . ."); Trangle Rebuttal

- 14 -

Report 5 ("Even if one accepts the 1% standard as reasonable, which in and of itself is debatable as to utilizing this as a standard . . . .").) Thus, Defendant has not indisputably shown that the 1% policy is "job-related."

### B. Genetic Information Nondiscrimination Act

Defendant argues that Plaintiff's claim under GINA fails as a matter of law because Defendant never requested, received, or considered Plaintiff's genetic information in making its employment decisions. Plaintiff argues that summary judgment is precluded because Defendant requested medical records without a warning to not disclose genetic information.

Subject to exceptions, GINA generally prohibits employers from requesting employees' or applicants' genetic information. 42 U.S.C. §§ 2000ff(2)(A)(i), 2000ff-1(b). "Genetic information" means information about an individual's genetic tests, the genetic tests of the individual's family members, and the manifestation of disease or disorder in the individual's family members. *Id.* § 2000ff(4)(A). An employer does not violate GINA by "inadvertently request[ing] or requir[ing] family medical history" of an applicant. *Id.* § 2000ff-1(b)(1). "[T]he acquisition of genetic information will not generally be considered inadvertent unless the covered entity directs the individual and/or health care provider from whom it requested medical information . . . not to provide genetic information." 29 C.F.R. § 1635.8(b)(1)(i)(A). However, failure to provide such notice will not prevent an employer from establishing that receipt of genetic information was inadvertent "if its request for medical information was not 'likely to result in a covered entity obtaining genetic information' (for example, where an overly broad response is received in response to a tailored request for medical information)." *Id.* § 1635.8(b)(1)(i)(C).

Plaintiff's GINA claim appears very weak, but the Court is unable to find on the present record that Defendant is entitled to summary judgment. Plaintiff has admitted that Defendant did not consider genetic information in making its employment decision. (DSOF ¶ 66; PSOF ¶ 66.) Plaintiff has also admitted that Defendant "made no inquiry

regarding genetic information." (DSOF ¶ 65; PSOF ¶ 65.) These admissions are not fatal, however, because Plaintiff's claim is not that Defendant asked Plaintiff for genetic information or used genetic information to make the employment decision. Rather, Plaintiff's claim is that Defendant unlawfully requested medical records without instructions to redact family history.

Defendant phrased its request as follows: "Please submit the following information by November 28, 2014: [c]opy of neurologist clinic notes from 2014 office visit[;] [c]opy of the 2014 MRI report." (Doc. 60-15.) Defendant argues its request was a "narrowly tailored" follow up "related to [Plaintiff's] aneurysm history and subsequent treatment—again, information which would not implicate family medical history."[4] The request itself makes no mention of Plaintiff's aneurysm, however, and thus Defendant has failed to show its request was unlikely to result in the receipt of genetic information.

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 58) is **denied**.

Dated this 21st day of November, 2018.

_____
Honorable Rosemary Márquez
United States District Judge

---

[4] Defendant also argues it did not receive genetic information because "the fact that an individual family member has been diagnosed with a disease or disorder is not considered genetic information if such information is taken into account only with respect to the individual in which such disease or disorder occurs and not as genetic information with respect to any other individual." (Doc. 63 at 16 (quoting *Maxwell v. Verde Valley Ambulance Co.*, No. CV–13–08044–PCT–BSB, 2014 WL 4470512, at *16 (D. Ariz. Sep. 11, 2014) (internal quotation marks omitted).) Defendant's argument is beside the point, as Plaintiff's claim rests on Defendant's allegedly unlawful request.